**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEFENDERS OF CONEWANGO CREEK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ECHO DEVELOPERS, LLC; ECHO | ) |
| WARREN ASSOCIATES, L.P.; ECHO | )   Civil Action No. 06-242 E |
| DEVELOPERS FUND I, L.P.; ECHO | ) |
| REAL ESTATE SERVICES CO.; UNITED | ) |
| STATES ARMY CORPS OF ENGINEERS; | ) |
| and the UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendants. | |

## OPINION

COHILL, J.

Presently pending before the Court is the Echo Developers', Echo Warren Associates', Echo

Developers Fund's, Echo Real Estate Services' ("Echo" or "Echo Defendants") Motion for

Summary Judgment (Doc. 39), the Echo Defendants' Motion to Dismiss (Doc. 41), the United

States Army Corps of Engineers' and the United States of America's ("Federal Defendants") Cross

"Motion to Dismiss Count 11" of the First Amended Complaint (Doc. 46), and the Plaintiff,

Defenders of Conewango Creek's, First Motion for a Preliminary Injunction (Doc. 6). A Motion

Hearing was held before this Court on August 21, 2007. For the reasons set forth below, we will

deny the motion for a preliminary injunction, grant the Federal Defendants' and the Echo

Defendants' motion to dismiss Count XI, grant the Echo Defendants' motion to dismiss as to

Counts II, V, VI, and VII, and Counts I, III, IV, VII and X, on separate grounds, and as to the

remaining counts, VIII and IX, we will grant summary judgment to the Echo Defendants and

dismiss the First Amended Complaint with prejudice.

1

## I. BACKGROUND/FACTS

In 2004 the Echo Defendants planned to construct a 396,000 square foot retail shopping center, with "big box" stores such as Lowe's and Wal-Mart, and a number of smaller stores, on approximately 67 acres in Conewango Township, Warren County, Pennsylvania (the "Warren Commons project"). To finance construction, the developers obtained approximately $15,660,000 prior to construction and also obtained equity investments of $3,000,000.

Conewango Creek and Jackson Run are streams located close to the property in question. Beginning in the spring and summer of 2004, the Echo Defendants began to seek various permits for construction, including those from agencies keeping watch over environmental impact issues. These agencies included the Pennsylvania Fish and Boat Commission, the United States Fish and Wildlife Service, and the Pennsylvania Department of Conservation and Natural Resources. The Fish and Wildlife Service indicated that no endangered species were present in the subject area, while the Pennsylvania Fish and Boat Commission noted the presence of some protected species, including freshwater mussels. The Fish and Boat Commission, however, noted that if its recommendations to protect water quality were implemented, the Commission would foresee no adverse impact upon the protected species.

In about November 2004, the Echo Defendants sought a general permit from the Commonwealth of Pennsylvania for the discharge of stormwater into Conewango Creek and Jackson Run. This application included an erosion and sedimentation control plan as well as a post-construction stormwater management plan. The Echo Defendants also submitted an application for the Encroachment Permit and the United States Army Corps of Engineers §404 permit, which was granted on February 18, 2005. In January, 2005, the Pennsylvania Department of Environmental Protection published in the Pennsylvania Bulletin notice of its receipt of the permit application.

2

Subsequently, several modifications were made to the Department of Environmental Protection application to provide a new stormwater outfall into the Conewango Creek and for additional water quality protections. These amendments were reviewed and approved, and in June 2005, the Pennsylvania Department of Environmental Protection granted a National Pollutant Discharge Elimination System ("NPDES") "PAG-2" permit (authorizing the discharge of stormwater into Jackson Run and Conewango Creek) and the Joint Encroachment/§404 permit, which authorized discharge as well as the construction of large stormwater outfalls at Jackson Run and Conewango Creek. In July, notice of the issuance of these two permits was published in the Pennsylvania Bulletin. Plaintiff did not appeal the issuance of these permits to the Environmental Hearing Board.

In September 2005, the Echo Defendants began construction on the project, including required environmental controls. Construction has continued from that time throughout the pendency of this litigation. On July 17, 2006, the Plaintiff and others commenced an action, C.A. 06-157 E (the "prior action"), through which they challenged the Corps' Verification Decision, the decisions to grant permits, and alleged environmental harm from the project, including harm to protected species. On August 15, 2006, the Echo Defendants were added to the Complaint.

Subsequently, the United States Army Corps of Engineers filed a motion requesting that certain issues raised in the prior action be remanded to them for reconsideration. We granted that motion, and on March 9, 2007, the United States Army Corps of Engineers completed its administrative review and issued to the Echo Defendants an individual permit pursuant to §404.

On October 20, 2006, Plaintiff filed a second civil action, the case at bar, this time naming as defendants the Echo Defendants, the developers of the Warren Commons Retail Center and the investigators and issuers of permits, the Federal Defendants, claiming violations of the Clean Water

3

Act and the Endangered Species Act. The First Amended Complaint in this second civil action, with ten counts, was filed on May 22, 2007. Through this suit, Plaintiff claims that the Warren Commons project discharges, through newly constructed outfalls, polluted stormwater into two streams in North Warren, Pennsylvania and threatens to extinguish the northern riffleshell mussel, a federally listed endangered species, in violation of the permits and the law.

On June 29, 2007, we approved the stipulation of dismissal of the prior action, C.A. 06-157E, and the prior action was closed.

On November 3, 2006, the Plaintiffs filed a First Motion for a Preliminary Injunction (Doc. 6) in the case at bar. This case was stayed for several months pending the outcome of the remand in the prior action. Thereafter, pursuant to our obligation under the federal rules, we also held three status conferences in an effort to readily address the request for injunctive relief, although plaintiff never seemed concerned with the immediacy of its lawsuit or its request for injunctive relief. On June 19, 2007, the Echo Defendants filed a Motion for Summary Judgment (Doc. 39), and a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12 (Doc. 41). On June 20, 2007, the Federal Defendants filed a Cross Motion to Dismiss Count 11 of the First Amended Complaint (Doc. 46). On August 14, 2007 this Court visited the site to acquaint itself with the general area in question. On August 21, 2007, we heard Oral argument on all these Motions and now issue a ruling and opinion.

## II. MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks to have this Court enjoin Echo Developers from two acts: first, from discharging pollutants including any additional stormwater into and through the Conewango Creek outfall, a 42 inch diameter pipe; and second, from new construction, excavation, paving, and operation within the Conewango Creek outfall watershed until such time as the Echo Defendants obtain a new or amended NPDES permit authorizing stormwater discharge from construction

activities in that watershed, and until further order of the Court.

To grant a preliminary injunction, the District Court must consider: (1) the likelihood of success on the merits; (2) the extent of irreparable injury from the alleged misconduct; (3) the extent of harm to the movant; and (4) the effect on public interest. Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir.1995); Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 191-92 (3d Cir.1990). The preliminary injunction remedy "must be reserved for extraordinary circumstances. . . ." Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 189 (3d Cir. 1990).

Plaintiff urges this Court to disregard the four-pronged traditional analysis, asserting that in cases alleging a violation of the Endangered Species Act a court in equity is stripped of its usual discretion. We will not disregard the traditional analysis. While we are generally obliged to uphold a statute and Congress' intent, the Court need not do so mechanically or under any and all circumstances. An injunction should issue only where the intervention of the Court is essential to effectively protect rights against otherwise irremediable injuries. Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982).

Plaintiff asserts that it will succeed on the merits because the Echo Defendants are discharging from an unlawful and not permitted outfall and that these discharges have harmed, and will continue to harm the northern riffleshell mussel. In particular, Plaintiff claims that the outfalls are illegally constructed and never received proper Clean Water Act or Endangered Species Act review. Plaintiff's likelihood of success on the merits of these central issues, were they to be fully litigated, is at best limited. Evidence in the record demonstrates that Echo obtained from the Commonwealth of Pennsylvania an Encroachment Permit for the construction of the outfall and the NPDES Permit for the discharge of stormwater and related pollutants through that outfall. With

respect to the alleged illegal discharge of pollutants, while we might desire pristine waters flowing through eternally unspoiled land, the Clean Water Act in fact provides for some discharge of pollutants into U.S. waters. Through a permit scheme, the Environmental Protection Agency may issue an NPDES permit pursuant to section 402 of the Clean Water Act, which provides for the "discharge of wastewater, including . . . any pollutant, or combination of pollutants" pursuant to that permit. 33 U.S.C.§1342. In Pennsylvania, pursuant to a "permit regime" approved by the EPA, the state may administer §402 in the federal government's stead. The Commonwealth of Pennsylvania Department of Environmental Protection issues NPDES permits to permit acceptable discharges into Pennsylvania waters. In contrast, under the Clean Water Act, a permit for dredged or fill materials is issued pursuant to Section 404 and may emanate only from the EPA, following an Army Corps of Engineers review. 33 U.S.C. §1344. Thus, on June 20, 2005, the DEP issued NDPES permits for the Warren Commons project. Echo Appendix to Opposition to Preliminary Injunction Exhibits D and H; see Kentuckians for the Commonwealth v. Rivenbaugh, 317 F.3d 425, 447 (4ᵗʰ Cir. 2003) (Section 402 creates a permit program, a combination of state and EPA regulatory activities, that authorizes the issuance of permits for the discharge of pollutants), and National Mining Ass'n v. United States Army Corps of Eng'rs, 145 F.3d 1399, 1401 (D.C. Cir. 1998) ("Section 402 authorizes EPA (or state agencies in some circumstances) to issue . . . NPDES permits to control the discharge of wastewater into navigable waters."). Plaintiff did not challenge the Department of Environmental Protection's issuance of the NPDES permit and did not appeal it to the Pennsylvania Environmental Hearing Board.

With respect to the plight of the northern riffleshell mussel, Plaintiff has not produced credible evidence establishing that the northern riffleshell mussel has been or will be harmed by the Warren Commons project. Plaintiff's chief expert, Dr. Dharmarajan R. Iyer, a professional

6

environmental engineer, stated in his affidavit that he "is not trained to quantify the precise impact these discharges will have on freshwater mussels in general and the Northern Riffleshell in particular. . . ." and "by training [is] not particularly qualified to assess the impact of stormwater specifically upon the Northern Riffleshell." Iyer Aff. at 4, 14, attachment to Notice of Motion for Preliminary Injunction. Dr. Iyer does nevertheless opine that changes in the Conewango Creek morphology *could* prove deleterious to the existence and habitat of the northern riffleshell mussel. Id. at 15 (emphasis added). On the other hand, the Army Corps of Engineers, in a detailed environmental assessment, concluded that the northern riffleshell mussel is not likely to be adversely affected by the Warren Commons project. The Army Corps of Engineers found that the Warren Commons project as a whole, including the storm water discharges, "is not likely to adversely affect the continued existence of any threatened and/or endangered species." Ex. B to Seeger Aff., at 19,17–21; App. at Ex. L. Finally, the United States Department of the Interior, Fish and Wildlife Service concluded that the northern riffleshell mussel was not in danger, stating that "[a]s described in the public notice, the federally listed, endangered northern riffleshell (*Epioblasma torulosa rangiana*) occurs in Conewango Creek, although we do not know if the species occurs in the immediate project area. Nevertheless . . . we concur with the Corps' determination that this project is not likely to adversely affect the species." Federal Defendant's Combined Memorandum, Ex. A. While the Plaintiff asserts that the northern riffleshell mussel was found above Carter's Dam, two miles away from the site (Seeger Aff. at B, p. 18), Plaintiff's conclusion that the northern riffleshell mussel is nearer the Warren Commons project site or that discharge from that site will impact it remains unsupported in the record. Plaintiff has had more than ample opportunity to provide concrete evidence that the mussel is near the Conewango Creek discharge and that it is in fact being adversely affected by that discharge. It has not provided this

evidence, and therefore, we find that Plaintiff is highly unlikely to prevail.

Just as the record does not support a likelihood of success on the merits, neither does it support a finding of irreparable injury, thus making the grant of a preliminary injunction improper. Marxe v. Jackson, 833 F.2d 1121 (3d Cir. 1987) (both likelihood of success on the merits and irreparable injury required for granting preliminary injunction). Plaintiff bears this burden of showing irreparable injury. Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.), cert. denied, 493 U.S. 848 (1989). In fact, Plaintiff must show immediate irreparable injury, which is more than merely serious or substantial harm. ECRI v. McGraw-Hill, 809 F.2d 223, 226 (3d Cir. 1987). Additionally, "the claimed injury cannot merely be possible, speculative or remote." Dice v. Clinicorp, 887 F.Supp. 803, 809 (W.D. Pa.1995). An injunction is not issued "simply to eliminate a possibility of a remote future injury." Acierno v. New Castle Cty, 40 F.3d 645, 655 (3d Cir. 1994)(citation omitted). We agree with Plaintiff, relying upon Natural Resources Defense Council v. Texaco Refining and Market'g, 906 F.2d 934 (3d. Cir.1990), that an environmental injury, by its very nature, is seldom reparable by money damages. Nevertheless, the harm must be demonstrated and not merely speculative. Here, despite ample opportunity, Plaintiff has not shown that the mussel is sufficiently near the discharge or that its population has in fact been damaged. Dr. Iyer, the Plaintiff's expert, suggested in his report that damage to the mussel population might not be fully evident until construction had advanced to a point where impervious surfaces predominate and stormwater runoff is increased. Iyer Aff. at 16, Notice of Motion for Preliminary Injunction. Even accepting these statements as true, they are speculative and insufficient to show immediate irreparable injury. See also Hoxworth v. Blinder, 903 F.2d 186, 205 (3d Cir. 1990) (emphasis added). Inexplicably, even though its own expert suggested that harm might be more readily ascertainable once construction has progressed, as construction unquestionably has progressed, Plaintiff has failed to provide

8

updated, actual evidence of harm to the northern riffleshell mussel. Similarly, Plaintiff has failed during the pendency of this litigation to provide a freshwater mussel survey which might show actual evidence of harm, though it took pains at the time of filing to show that such a survey had been arranged and was halted by weather and water conditions until spring, 2007. Bolster Aff. at 3, Notice of Motion for Preliminary Injunction.

Finally, Plaintiff delayed more than a year following the issuance and public announcement of the NDPES permit to Echo and then delayed yet again in pursuing its request for injunctive relief before this Court. Plaintiff's failure to timely and diligently pursue its request for injunctive relief undercuts Plaintiff's argument that time is fleeting and that urgent measures are needed to arrest harm to the northern riffleshell mussel. See Sierra Club v. United States Army Corps of Eng'rs, 2005 U.S. Dist LEXIS 36385, *61 (D. N.J. 2005) (delay in moving for preliminary injunction undermines claim of irreparable injury); Kobell v. Suburban Lines, 731 F.2d 1076 (3d Cir. 1984) (district court may deem suspicious that party asking to preserve status quo allows status quo to change through unexplained delay).

Were the preliminary injunction requested by Plaintiff to issue, Echo would be required, among other things, to cease discharging any stormwater into and through the Conewango Creek outfall, to cease further construction, to cease use of the development and "operation within the Conewango Creek outfall watershed." See Proposed Order on Preliminary Injunction (emphasis added). As Echo has asserted, and as this Court had an opportunity to confirm at an August 14, 2007 site visit, the Warren Commons project is essentially complete: we observed completed excavation and paving, as well as a host of shops open and operating, including Lowe's, Wal-Mart, Burger King, and Bob Evans. For this Court to grant Plaintiff the relief it seeks would require these businesses to close and to prohibit all vehicles from entering the site. The damages to Echo, both

9

quantifiable, in terms of lost revenue and its ability to service its debt, and not easily quantifiable, in terms of harm to reputation and exposure to liability, would be enormous. This Court will not, under these particular circumstances, force Echo to undo an entire completed, functioning shopping center.

We fail to understand how granting the requested injunction would serve or effect the public interest. Plaintiff argues that the injunction would "serve the public interest by halting Echo's trend of unlawfully constructing outfalls, violating the Clean Water Act, and harming the Northern Riffleshell with illegal discharges," see Plaintiff's Memorandum at 25; nevertheless it has not provided evidence showing that the outfalls were illegal, violated the Clean Water Act, or harmed the mussel. While maintaining the integrity of wetlands and streams is a laudable goal which serves the public interest, the Plaintiff has not made a factually satisfactory nexus between Echo's complained of actions and that worthwhile goal. Plaintiff's general assertions about the need to protect the environment and endangered species are unavailing to achieve its desired end.

On the other hand, Echo points to specific benefits which the Warren Commons project has brought the public, in particular, new economic vitality to the area in which the Warren Commons project is located. Among other things, Echo has shown that approximately 500 jobs have been created, App. Ex. 3 (Haney Aff.), and that tax revenues are estimated at $2,000,000 per year. Id. at ¶12. Less quantitatively, Warren Commons provides other needed services to this rural community, such as such as retail stores, banking and restaurants.

In sum, under the traditional analysis, Plaintiff is not entitled to the extraordinary remedy of preliminary injunctive relief.  In addition, the Court is inclined to agree with Echo's assessment that Plaintiff "did not proceed with the 'sense of urgency' which generally accompanies a sincere and legitimate belief that, unless action is taken immediately, irreparable harm will occur." Echo's

10

Brief in Opposition to Preliminary Injunction at 60-61. Accordingly, we will deny the Motion for a Preliminary Injunction.

## III. MOTION TO DISMISS

We next turn to Defendants' position that we must dismiss several counts of the First Amended Complaint because we lack subject matter jurisdiction to hear the claims. In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, which attacks the complaint as deficient on its face, the Court takes all allegations in the complaint as true. Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). When, however, the motion, attacks the existence of subject matter jurisdiction in fact, no presumptive truthfulness attaches to plaintiff's allegations and the Court may weigh the evidence to satisfy itself that subject matter jurisdiction exists in fact. Id. at 891; see also Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3rd Cir. 2000).

### A. Echo Defendants' and Federal Defendants' Motion for Dismissal of Count XI

Both the Echo Defendants and the Federal Defendants have asserted in their respective Motions for Dismissal (Docs. 41, 46) that this Court lacks jurisdiction over Count XI of the First Amended Complaint because Plaintiff failed to give the requisite statutory notice under the Endangered Species Act that it intended to raise a claim thereunder. All the Defendants assert that the Endangered Species Act requires a citizen plaintiff to provide a sixty day written notice of intent to file suit for an alleged Endangered Species Act violation and expressly precludes an action under the Endangered Species Act by a citizen if that notice is not provided. Alternatively, the Federal Defendants contend that Count XI must be dismissed because Plaintiff has failed to perfect service.

11

Count XI alleges that "The federal Defendants have violated ESA §7(c), 16 U.S.C. 1536(c), in that [they] have failed and refused to 1) obtain a list from USFWS . . . of endangered or threatened species that may be present in the vicinity of the project. . . and 2) prepare a Biological Assessment with respect to the Northern Riffleshell freshwater mussel and . . . other endangered . . . species . . . ." Plaintiff's First Amended Complaint at ¶180. Thus, according to Plaintiff, the Clean Water Act §404 issuance to Echo Defendants was improper "by reason of §7(c) of the Endangered Species Act, 16 U.S.C. §1536(c)." Id. at ¶181.

Though Plaintiff has taken care to style Count XI as a claim under the Administrative Procedure Act, it may only properly be brought under the Endangered Species Act. Section 704 of the Administrative Procedure Act provides that an agency action is reviewable under the Administrative Procedure Act only if no other remedy exists. In relevant part, this section states:

§ 704. Actions reviewable.

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. . . .

5 U.S.C. § 704. However, Count IX of the first amended complaint asserts that the Federal Defendants have violated the Endangered Species Act. Section 1540(g) of the Endangered Species Act permits a "citizen" to commence an action under the Endangered Species Act "... to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this Act" and a court may enforce such a provision. 6 U.S.C. § 1540(g)(1). In this situation, the Administrative Procedures Act duplicates the remedy expressly conferred by the Endangered Species Act, and thus by the Administrative Procedures Act's proviso, 5 U.S.C. § 704, it has no application here. The only recourse for Plaintiff is a citizen-suit under the Endangered Species Act. See Allegheny Cty. Sanit. Auth. v. U.S.E.P.A., 732

F.2d 1167, 1176-77 (3d Cir. 1984) (APA proviso providing for judicial review when no other adequate remedy in a court is available, inapplicable where citizen-suit available under Water Pollution Control Act). See also Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) (although thrust of § 704 was to codify exhaustion requirement, provision also makes clear that Congress did not intend grant of review in APA to duplicate procedures for agency action review.)

The Endangered Species Act requires sixty day notice of a citizen suit. 16 U.S.C. §1540(g)(2)(A)(i) (no suit may be brought "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation"). This notice is a jurisdictional prerequisite to suit. Hawksbill Sea Turtle v. FEMA, 126 F.3d 461, 471 (3d Cir. 1997). Plaintiff has conceded that "No citizen pre-suit notification was served relative to Count XI." Plaintiff's Combined Memorandum of Law (Doc. 53) at 2. Plaintiff's failure to provide proper notification under the Endangered Species Act leaves this Court without subject matter jurisdiction over Count XI and thus, Count XI must be dismissed.   See also Bennett v. Spear, 520 U.S. 154 (1997) (violation of section 7 on the part of an action agency is an ESA citizen suit for which 60-day notice is required). We note too that despite ample notice of its failure of service and ample opportunity to do so, Plaintiff did not serve the First Amended Complaint upon the Federal Defendants as required under Fed. R. Civ. P.  4(i)I(A) and  Fed. R. Civ. P.  12(b) 5, and thus, Count XI may be also dismissed for insufficiency of service.

B.  Echo Defendants' Motion for Dismissal of Counts II, V, VI and VII

The Echo Defendants have moved for dismissal of Counts II, V, VI and VII on the basis that this Court lacks subject-matter jurisdiction over these claims.  Where a defendant moves to dismiss a case because the court lacks subject matter jurisdiction, the Plaintiff must prove that jurisdiction exists.   Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884 (3d Cir. 1977); see Fed. R.

13

Civ. P. 12(b)(1). Similarly, in a challenge of subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Mortensen, 549 F.2d at 891.

According to Echo, in those enumerated Counts, Plaintiff is actually challenging the Encroachment Permit and NPDES Permit issued to Echo on June 20, 2005. Plaintiff also challenges the adequacy of Echo's Erosion and Sedimentation Control Plan and Echo's Post-Construction Management Plan, which gained Pennsylvania Department of Environmental Protection approval during its review of Echo's request for the §402 NPDES Permit and the Encroachment Permit.

Whatever the veneer on the counts, assuming Plaintiff is challenging final Pennsylvania-issued permits, that challenge is properly brought in a Pennsylvania court, with the state able to defend the permit decision and terms, and not here in federal court. Indeed, a "final state-issued permit is subject to judicial review in state court, with the state defending the permit decision and terms." Municipal Auth. of St. Marys v. United States EPA, 945 F.2d 67, 68 (3d Cir. 1991) (parties seeking to challenge DEP permit must file appeal with the Pennsylvania Environmental Hearing Board); see 35 P.S. § 7514. The Environmental Hearing Board's regulations require that a third party challenging an action of Department of Environmental Protection must file its appeal within 30 days of publication of notice in the Pennsylvania Bulletin. See 25 Pa. Code § 1021.52(a)(1). Failure to timely appeal precludes further challenges to the action. See 35 P.S. §514(c)("…If a person has not perfected an appeal in accordance with regulations of the board the department's action shall be final as to the person.")

14

In simplified form, Echo characterizes the allegations in the First Amended Complaint as follows: Count II: outfalls on Conewango Creek and Jackson Run will discharge stormwater contaminated with pollutants that are known to harm the Northern Riffleshell mussel and those discharges will "harm" and "harass" the Northern Riffleshell; Count V: post-construction stormwater discharges will contain pollutants and pollutant discharge will not be prevented by Echo's post-construction stormwater management practices under the general permit; Count VI: post-construction stormwater discharges will contain pollutants, not strictly stormwater, and are thus not in compliance with Echo's NPDES permit; and Count VII: Echo failed to comply with the General NPDES Permit for Discharge of Stormwater Related to Construction Activity ("PAG-2") because the discharge of stormwater may adversely affect a federally listed endangered species.

In its opposition to Echo's Motion for Dismissal of Counts II, V, VI and VII for lack of jurisdiction over subject matter, Plaintiff has the burden of challenging the substance of Echo's contentions and showing that jurisdiction does exist.   Plaintiff fails in its Memorandum of Law Opposing Defendants' Motions to Dismiss (Combined Memorandum [Doc. 53] at 7-10) to engage Echo's central jurisdictional claim, that the Plaintiff was required to raise objections to the discharge of stormwater with the Pennsylvania Department of Environmental Protection.  Instead, Plaintiff, perhaps misunderstanding that the Plaintiff bears the burden of persuasion on a challenge to subject matter jurisdiction, makes the general and inaccurate assertion that Echo has cited no case law to demonstrate that this Court lacks jurisdiction.

Plaintiff proceeds through each count, essentially restating its substantive claim rather than addressing the jurisdictional issue at stake.  For example, as to Count II, Plaintiff states that the NPDES permit does not permit the regulated party to "take" endangered species by polluted discharges. As to Count V, Plaintiff asserts that it is not questioning the issuance of the permit, but

15

rather Echo's failure to comply with terms and/or conditions of the permit. As to Count VI, Plaintiff states that this is not a challenge to issuance of permit; now Echo is discharging pollutants for which permit needed but not obtained, i.e. not just stormwater. With respect to this count, Echo assents that the NPDES permit authorized the discharge of the complained-of pollutants, including "surface runoff and drainage" into public waters. App. Ex. D at 9. As to Count VII, Plaintiff claims that Echo violated a condition of the Clean Water Act permit authorization because it failed to notify the Army Corps of Engineers and the United States Fish and Wildlife Service when it learned that an endangered species and/or critical habitat was present. With respect to this count, Echo notes that the permits in question were issued after the Pennsylvania Fish and Boat Commission advised that some protected mussel and fish species were known in the general area and that if certain measures were employed, the Fish and Boat Commission "[does] not foresee any significant adverse effects from the proposed activity to the freshwater mussel species of special concern. . . ." App. at Ex. J.

After reviewing the First Amended Complaint and parties' arguments, it is evident that the Plaintiff is in those counts challenging final Pennsylvania-issued permits. Indeed, this tug-of-war between the parties about the Pennsylvania permits, when they were issued, under what circumstances, with what knowledge, with what coverage, and using what definitions, perfectly illustrates that such challenges are properly brought in the Pennsylvania courts, with the state able to defend the permit decision and terms, and not here in federal court, a court of limited jurisdiction.

The Pennsylvania Department of Environmental Protection issued the NPDES permit on June 20, 2005. App. at Ex. 2, Affidavit of John Palovsky at 9; App. at Ex. D, with that fact published in the Pennsylvania Bulletin on July 23, 2005. App. at Ex. H. Plaintiff then failed to challenge the Department of Environmental Protection's issuance of the permit before the proper

16

authority and this Court has no jurisdiction to do so now.

### C.  Echo Defendants' Motion for Dismissal of Counts I, III, IV, VII and X

The Echo Defendants have also moved for dismissal of Counts I, III, IV, VII and X.  (The discussion herein of Count VII provides an alternative basis for dismissal to that discussed in III. B. supra.)  The Echo Defendants assert that Counts I, III, IV, VII and X attempt to litigate issues which have been rendered moot by the United States Army Corps of Engineers' issuance of the Individual Permit.  The Individual Permit from the Corps, according to the Echo Defendants, addressed and/or remedied the points raised by Plaintiff in those counts.

The Constitution's Article III limits the judicial power to the resolution of cases and controversies. U.S.C.A. Const. Art. 3, § 2, cl. 1.  Pennsylvania Family Institute. v. Black, 489 F.3d 156 (3d Cir. 2007).  Similarly, when issues presented in a case are no longer live, the case becomes "moot," and the court no longer has subject matter jurisdiction.  Weiss v. Regal Collections, 385 F.3d 337 (3d Cir. 2004).

Plaintiff's counter-argument suggests that Plaintiff agrees that the violations complained-of in these counts no longer exist, beginning with the statement that "when suit was filed in the month of October, 2006, the Echo Defendants were committing the following violations of federal law." Plaintiff's Combined Memorandum of Law (Doc. 53) at 10 (emphasis supplied).  Similarly, Plaintiff does not contest that the Army Corp's of Engineers Individual Permit supersedes the complained-of General Permit, the PASPGP-2 and suggests that the application for an Individual Permit was "in order [for Echo] to come into compliance with the Clean Water Act."  Plaintiff nevertheless asserts that the claims are not moot because the alleged wrong behavior could be

17

expected to recur and seeks to place the burden on the Echo Defendants to demonstrate that they are
"absolutely incapable" of returning to their old ways. Id. at 12.

The exception from the mootness doctrine for cases that are technically moot, but capable of
repetition, yet evading review, is narrow and available only in exceptional situations. Rendell v.
Rumsfeld, 484 F.3d 236 (3d Cir. 2007). This is not one of those situations.  Counts I, III, IV, VII
and X alleging violations under the general permit were not alive at the time Plaintiff filed its First
Amended Complaint, which evidently should have been amended further before filing with the
Court.  Further, Plaintiff's concern that the Echo Defendants would seek to use the superseded
permit to repeat the earlier alleged violations at the same site is illogical.

We agree with the Echo Defendants that these Counts allege that they and/or the Army
Corps of Engineers took action improperly under the General Permit PASPGP-2.  General Permit
PASPGP-2, however, has been superseded by the Individual Permit, and was already superseded at
the time Plaintiff filed its First Amended Complaint on May 3, 2007.  The Individual Permit, as
explained in the Corps' Environmental Assessment and Statement of Findings, gives authorization
for the actions challenged in these counts.  See Supplemental Affidavit in Support of Motion for
Preliminary Injunction of David J. Seeger ("Seeger Affidavit"), at Exhibit B, at 7-8, ¶ E.  In short,
violations of a superseded permit cannot give rise to the requested injunctive, or any, relief.
Because we will dismiss Counts I, III, IV, VII and X on the basis of mootness arising from the
superseded permit, we will not address here the Echo Defendants' alternative argument that these
Counts are moot because a substantial portion of the construction project is completed.

## IV.  MOTION FOR SUMMARY JUDGMENT

We next turn to the Echo Defendants' pending motion for summary judgment on the
entire First Amended Complaint based on the single ground of laches. In practical terms, this Court

retains subject matter jurisdiction only as to Counts VIII and IX which allege ongoing violations, the other counts having been found to be lacking subject matter jurisdiction. The Echo Defendants maintain that judgment should be entered in their favor because (1) Plaintiff's delay in commencing this action was inexcusable, (2) Plaintiff's subsequent failure to diligently prosecute the case was inexcusable, and (3) Echo has been substantially prejudiced by Plaintiff's failure to timely commence and prosecute this action.

Summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio, 475 U.S. 574, 586 (1986). Rather, it "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587, quoting Fed. R. Civ. P. 56(e).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.1993), citing Wright and Miller, Federal Practice § 2721; Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J.1956), aff'd, 248 F.2d 543 (3d Cir.1957), cert. denied, 355 U .S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.")

19

Since laches is an equitable doctrine, its application is controlled by equitable considerations and entrusted to the sound discretion of the Court viewing the circumstances of the particular case. See Burnett v. New York Cent. R. Co., 380 U.S. 424, 435 (1965). A party asserting a defense of laches must establish two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay. University of Pittsburgh v. Champion Products, 686 F.2d 1040, 1044 (3d Cir. 1982). The state of the Plaintiff's knowledge is an element in determining whether the delay is inexcusable. Id. For all practical purposes, Pennsylvania and federal law in this field are identical. Id.; see Anheuser-Busch v. Du Bois Brewing, 175 F.2d 370, 373-74 (3d Cir. 1949), cert. denied, 339 U.S. 934 (1950); Artus Corp. v. Nordic , 512 F.Supp. 1184, 1187 (W.D. Pa.1981); Consolidated Home Specialties v. Plotkin, 55 A.2d 404, 412 (Pa. 1947).

In its brief in support of its motion, the Echo Defendants review cases from other federal courts in which laches been applied to environmental suits. Particularly illuminating is a case in which the United States District Court for the Middle District of Pennsylvania held that "[i]n an environmental action, whether the defendant has been prejudiced by the delay is determined by how much of the project has been completed, whether the relief which plaintiff seek is still practicable, among other factors." Don't Ruin Our Park v. Stone, 802 F.Supp. 1239, 1245 (M.D. Pa.1992). If the project has been substantially completed or has already had an irreversible impact on the environment, injunctive relief would serve no purpose, and the plaintiff cannot obtain meaningful relief. The court further noted that whether the plaintiff can obtain meaningful relief rests upon whether the project has been substantially completed or has already had an irreversible impact on the environment. Id.

A. Plaintiff's Delay in Asserting its Claim

20

The record shows that on November 15, 2004, Echo submitted a joint application for the

Encroachment Permit and the U.S. Army Corps of Engineers § 404 Permit. App. Ex. 2 (Palovsky

Aff.), at ¶ 4. On January 8, 2005, the Department of Environmental Protection posted the notice of

the receipt of that application in the Pennsylvania Bulletin, Volume 35, No. 2. First Amended

Complaint, ¶ 24; App. at Ex. H. The notice described, among other things, the nature of the

Project; identified that certain wetlands were to be filled; reflected that wetlands were to be

restored; reflected that wetlands were to be enhanced; and reflected that a stormwater outfall

discharging into Jackson Run was to be constructed. App. at Ex. H.

On July 23, 2005, the Department of Environmental Protection published in the

Pennsylvania Bulletin that it had issued a PAG-2 permit, authorizing the discharge of stormwater to

both Jackson Run and Conewango Creek. App. at Ex. H, and that it had issued Encroachment

Permit, expressly authorizing the construction of two 3-foot diameter and one 3.5 foot diameter

stormwater outfalls discharging to Jackson Run and Conewango Creek. App. at Ex. C. On

September 19, 2005, Echo began construction on the Warrens Commons Project, and construction

has been ongoing from that time to this. Id. at ¶13.

On July 17, 2006, one year and five months after the first publication that a permit had been

issued for the Warren Commons project, and more than one year after the Department of

Environmental Protection granted to Echo the NPDES Permit and the Encroachment Permit,

Plaintiff (and a group of other individual plaintiffs no longer in this action), instituted the prior

action in this Court, against various federal defendants.

On August 15, 2006, plaintiffs in the prior action filed an amended complaint

adding Echo as Defendants and filed on September 1, 2006, a Motion for a Preliminary Injunction.

By that time, almost 85% of Echo's total Project costs had been incurred. App. Ex. 3

(Haney Aff.) at ¶ 10, Attachment 2. By that time, the new outfall to the Conewango Creek was complete, and had been completed since December 2, 2005; the new outfall to Jackson Run was complete and had been completed since December 16, 2005; the rip-rap was completed on or about March 20, 2006; stormwater control facilities authorized and required by the NPDES Permit were in place and functioning; the Lowe's Store was complete and within weeks of opening; underground utilities were installed throughout the entire site and site grading was completed; and the Wal-Mart building was complete and site work, including final grading, installation of curbs and paving, was between 75% and 100% complete around the Wal-Mart building. App. Ex. 2 (Palovsky Aff.) at ¶¶ 13-16.

On October 20, 2006, Plaintiff and the original individual plaintiffs filed this action and on November 3, 2006, Plaintiff and the original individual plaintiffs filed a Motion for Preliminary Injunctive Relief. By November 3, 2006, the site work was complete, as well as the small shop buildings. App. Ex. 2 (Palovsky Aff.) at ¶ 18. Moreover, a Dollar Tree, Fashion Bug, Maurice's, Sally Beauty, GNC, Game Stop and Olympia Sports opened between December, 2006 and February, 2007, id., and by the end of November, 2006, Warren Commons was 95% complete and 95% of Echo's total estimated Project costs had been spent. Id.

On November 29, 2006, and in response to Echo's Motions, this Court, among other actions, granted a stay of litigation, pending the Corps' review of issues regarding the prior action. On March 9, 2007, the Corps issued a status report in the prior action, advising that its review was complete and that an Individual § 404 Permit was issued to Echo.

As a result, on March 19, 2007, this Court held a telephone status conference, during which counsel for Plaintiff advised that the prior action would be withdrawn; the Motion for Preliminary Injunctive Relief would be amended on or before March 23, 2007; Defendants'

22

responses would be due on April 15, 2007, with Plaintiff's reply being filed on April 23, 2007.

The filing of an amended complaint was also discussed. At that conference, this Court ordered
that:

*Plaintiff shall submit a proposed scheduling stipulation in 2 weeks time. Plaintiffs
will amend complaint and withdraw other complaint.* Defendants request additional
discovery prior to preliminary injunction hearing. Defendant Echo requests 60 days
to answer amended complaint. *Plaintiffs will amend prior motion for preliminary
injunction on or before 3/23/2007;* defendants' response to motion due 4/15/2007;
plaintiffs' reply to response due 4/23/2007. (emphasis added)

Plaintiff did not comply with the March 19 Order, did not file an amendment to the Motion

for Preliminary Injunctive Relief by the March 23, 2007 due date, and Plaintiff's attorney did not

return several phone calls from Chambers inquiring as to the scheduling of a hearing on the motion

for preliminary injunction and status of the case..

On May 3, 2007, rather than submitting the ordered status report, Plaintiff filed a

Supplemental Affidavit in Support of Motion for Preliminary Injunction; attached to that document

was Plaintiff's Supplemental Memorandum of Law in Support of the Request for Preliminary

Injunctive Relief and a First Amended Complaint, for which no leave to file was sought or

obtained. The First Amended Complaint added the Army Corps of Engineers and the United States

of America as new defendants and the eleventh count was added. By that time, more than 95% of

the Project was complete and more than 90% of Echo's Project costs had been incurred. App. at Ex.

3 (Haney Aff.) at ¶ 10, Attachment 2.

On May 21, 2007, this Court held another telephone status conference during which the

parties established a revised schedule for responding to Plaintiff's filings and on the following day,

Plaintiff filed the First Amended Complaint by leave of Court. We note that at that status

conference, Plaintiff's counsel admitted that he had not met the deadlines the Court had earlier set.

Wal-Mart opened for business on March 14, 2007, and Dollar Tree, Fashion Bug,

Maurice's, Sally Beauty, GNC, Game Stop and Olympia Sports opened between December, 2006
and February, 2007 and are in operation. App. Ex. 2 (Palovsky Aff.), ¶¶ 17, 18. A Burger King and
a Bob Evans Restaurant are open and operating on out-parcels. Id.

As of June 19, 2007, the Warren Commons project was essentially complete, except for the
construction of a few smaller structures on small out parcels. Id. at ¶ 22.

Plaintiff has provided no reason as to why it waited over a year from the date that the
NPDES Permit and the Encroachment Permit were issued, and a year since construction
commenced, to sue Echo and seek preliminary and permanent injunctive relief to shut down Warren
Commons. Plaintiff either was aware, or should have been aware, of the issuance of the permits
and the nascence of the Warren Commons project, a huge shopping center talked about in the
community. We agree with the Echo Defendants, too, that Plaintiff or its members, all of whom
have significant interest in the activities in the area, could hardly disclaim knowledge of the Warren
Commons project. Plaintiff or its members should have been aware of major construction activity
at the huge site, particularly earth moving, even if it failed to note as it should have the appropriate
notices in governmental publications.

The Court agrees too that Plaintiff has not been diligent in seeking review of the permit
issued by the agency. Despite certain knowledge of the Warren Commons project, and professing
vehement environmental objections to it, Plaintiff did not initiate action to obtain review of the
permits until over a full year from the time the permits were issued. At that point, among other
things, the construction work had been underway for ten months, the grading and utilities
completed, the outfalls completed, and the Wal-Mart and Lowes built. In Allens Creek v. Caldera,
88 F. Supp.2d 77 (W.D.N.Y. 2000), aff'd 2 Fed. App. 162 (2d Cir. 2001), an environmental case in
which the plaintiff was represented by the very attorney now representing Plaintiff, the court termed

24

an eight month delay "substantial" and "sufficient for the application of the laches defense." Id. at
83.

The similarities to Allens Creek continue. The court also stated that "that plaintiffs' *post-*
filing delay further supports my finding that plaintiffs have inordinately delayed their prosecution
of this action." Id. (emphasis in original). Here, the Plaintiff waited until November 2006 to try to
stop the construction by filing a Preliminary Injunction. As previously discussed, Plaintiff ignored
this Court's March 19, 2007 Order, which attempted to move the case along. Plaintiff was ordered
to submit a proposed scheduling stipulation in 2 weeks time. Plaintiff did not comply. Plaintiff
was ordered to amend the complaint and withdraw the prior complaint. Plaintiff did not comply.
Plaintiff was ordered to amend the prior Motion for a Preliminary Injunction before March 23,
2007. Plaintiff did not comply. Without a doubt, Plaintiff has not proceeded with the sense of
urgency that would accompany genuine outrage about harm to an endangered species or to
waterways. The delay occasioned by Plaintiff in first bringing and then pursuing its claim, was
inordinate.

In memoranda and at oral argument, the Plaintiff has sought to escape the delay charge by
pointing out its satisfaction of the statute of limitations. Compliance with the statute of limitations
is no protection against a charge of inordinate delay and has been specifically rejected by the
Supreme Court in Gardner v. Panama R., 342 U.S. 29, 30 (1951) ("Through the existence of laches .
. . the matter should not be determined merely by a reference to and a mechanical application of the
statute of limitations. The equities of the parties must be considered as well.")

### B. Prejudice Resulting to Echo Defendants from Delay

To prevail, the Echo Defendants must demonstrate that they have been prejudiced by
Plaintiff's inexcusable delay in commencing this action and by Plaintiffs failure to diligently

prosecute its case. In this instance, we find that Plaintiff's inordinate delay has prejudiced the Echo Defendants. For example, as a result of Plaintiff's undue delay in commencing this action, Echo incurred substantial debt to finance the Project. App. at Ex. 3 (Haney Aff.) at ¶ 8. In addition, during the pending litigation, Lowe's would not close on the property, id. at ¶6, which has in turn prevented Echo from obtaining funds to pay approximately $9,400,000.00 of bank debt. Id. at ¶ 8. Finally, the threat of an injunction has prevented Echo from being able to sell the remaining portions of the Warren Commons project in order to obtain funds necessary to pay off approximately $6,275,000.00 of bank debt related to the construction of remaining stores. Id. at ¶11. Echo expended considerable time, effort, and money in reliance on the validity of the permits it obtained.

Plaintiff's claim that the Echo Defendants, knowing of potential litigation and a potential injunction against them, sped up the progress of the Warren Commons project at their own peril. This is unavailing. This argument shows Plaintiff's knowledge and delay in filing this action. As the United States District Court for the Western District of New York held when the same claim was made in Allen's Creek, "no party should be held hostage to the threat of litigation." Allen's Creek, 88 F. Supp.2d at 85. Although we recognize that the application of laches is disfavored in environmental cases, we find that Plaintiff's delays both in bringing and prosecuting this action have sufficiently prejudiced the Echo Defendants such that laches applies in this instance. We therefore hold that Plaintiff's remaining claims are barred by laches and we will order judgment for the Echo Defendants on them.

Accordingly, the Echo Defendants' motion for summary judgment will be granted as to

Counts VIII and IX, those over which this Court retains jurisdiction. The First Amended Complaint

is dismissed with prejudice.

*Maurice B. Cohill, Jr.*

Maurice B. Cohill, Jr.

Senior United States District Court Judge

Dated:    November 11, 2007

27